## 31768. DOUTHIT v. THE STATE.

HILL, Justice.

This is a death case. Following trial by jury in Cobb County, Ronald Douthit was found guilty of the offense of murder. The case is before this court on appeal and for review of the death sentence. The jury had before it the evidence which follows.

While walking along Log Cabin Drive in Smyrna, Georgia, at approximately 9:30 a.m. on Wednesday, December 17, 1975, Silas Stephens noticed the feet of a body protruding from a ditch. The body was clothed except that the victim's shoes were missing. The police were summoned and the body of Leonard Karl Frazier was identified. During autopsy three bullets were recovered from the victim's head, one of which caused death by passing into the brain. The victim had been dead at least eight hours but not more than three days.

In an interview with two of the victim's brothers, the police learned that the defendant and the victim were cousins, that the defendant formerly employed the victim, and that the two stayed together with Rodney Dulaney at a former kennel where they kept a small caliber gun. After obtaining a search warrant the police proceeded to the kennel where they met and interrogated Michael Beasley and Michael Barrett (see below). While police were conducting the search, the defendant and Dulaney arrived. They were then advised of their constitutional rights.

The police found that the defendant had insurance on Leonard Frazier's life. The defendant subsequently retrieved a .22 caliber pistol from the place where he was employed.

The defendant told police that he, Dulaney, and Frazier were together at the kennel, and the defendant went across the street to a fruit stand. On his way back, the defendant heard two shots and entered the kennel where he saw Dulaney coming up the basement steps saying he had shot Frazier. He and Dulaney then took Frazier's body to Log Cabin Drive, where they dumped it. They threw his shoes into a river. The defendant took the detectives to the basement and showed them where

Frazier had been shot and pointed out some aluminum screen with blood stains and stated Frazier had fallen on it. Although the blood test was not conclusive, the blood on the aluminum screen had the same A and B blood factors as found in the victim's blood.

Ballistics comparison of the three bullets found in the victim's body with bullets fired from the .22 caliber pistol retrieved from the defendant revealed that one of the bullets found in the body was fired from the gun. The second bullet was too mutilated to compare, but a firearms expert testified that the third bullet was probably fired from the gun.

Michael Barrett, an acquaintance of the defendant, was in the insurance business. The defendant had asked him numerous detailed questions about insurance, including hypothetical questions regarding insurance taken out on an elderly person with heart trouble who would probably die. Dulaney was present during these discussions. Barrett replied that the insurance company would investigate and discover that the person was a poor risk, and that the insurance would be refused. The defendant asked about getting insurance on a cousin who drank, shot guns, and would eventually get killed. The defendant said the father would be the beneficiary and that this would help out the family.

The defendant then told Barrett that he already had insurance on his cousin and wanted another $37,000 with double indemnity. He offered Barrett $25,000 of the resulting insurance money if he would arrange things so that the policy would be issued. On Saturday, December 13, 1975, when Barrett went to the kennel to tell the defendant and Dulaney he wanted nothing more to do with them, he noticed a .22 caliber pistol. After leaving and going to a nearby convenience store, Barrett saw Dulaney in a car pointing a gun at him. The defendant was with Dulaney in Michael Beasley's car.

On the following Monday, December 15, Barrett went to the kennel because Dulaney told him they had something to tell him. Barrett noticed some bullet holes in the den. Dulaney said he had shot the .22 pistol. Dulaney also stated he would be buying a new car later because he was coming into some money. After defendant's arrest he

called Barrett several times. Defendant said that Dulaney threatened Barrett's life if Barrett testified. Defendant also said that Dulaney had wanted to kill Barrett at the convenience store, but the gun had not been loaded. The defendant told Barrett that Dulaney "did it" and that he (the defendant) had never fired the gun.

On the Saturday night before Frazier's body was found, Michael Beasley was visiting the defendant and Dulaney at the kennel. After stating they wanted to find Leonard Frazier, Beasley accompanied defendant and Dulaney in Beasley's car and drove around looking for Frazier. They saw Frazier on Log Cabin Drive and then drove to the defendant's house. The defendant and Dulaney then told Beasley that they wanted to cut through the woods and kill Frazier. Later the defendant and Dulaney returned saying someone had seen them and that they would get Frazier later. The defendant and Dulaney told Beasley that they would collect insurance money. On Sunday night Beasley went with the defendant and Dulaney to look at cars. They were looking at Continental Mark IVs. They told Beasley they would also buy him a car.

Jeffrey Lee Faircloth, insurance agent, had written a $15,000 life with double indemnity policy on Leonard Frazier at the defendant's request. It had been issued on September 28, 1975, and named Frazier's father as beneficiary. The defendant told Faircloth that Frazier was no longer employed at the kennel, but that since Frazier was his cousin, the defendant would continue to pay the premiums to help him out. When Faircloth first delivered the policy to the defendant, the defendant had said that Frazier might change beneficiaries. Later, a person identifying himself as Leonard Frazier called Faircloth. Faircloth had never met Frazier. The caller informed Faircloth that he wanted to change his life insurance beneficiary because his father, the beneficiary at the time, was an alcoholic. The caller then stated he wanted the defendant, Ronald Douthit, as his beneficiary because they were cousins. When Faircloth suggested getting together to sign the forms, the caller said he was too busy and just wanted the forms mailed. Faircloth mailed the forms and defendant Ronald Douthit became

the beneficiary on December 10, 1975. When the defendant called Faircloth and asked if Frazier had changed beneficiaries, the defendant was informed that Frazier had done so.

The defense called no witnesses.

The jury found the defendant guilty and thereafter imposed the death penalty. The defendant's motion for new trial, as amended, was overruled by the trial court.

1. Defendant urges that the evidence does not support the verdict and that the verdict is contrary to law. In light of the facts, recited in summary above, the verdict of the jury is amply supported by the evidence and is not contrary to the law or evidence. See *Proctor v. State,* 235 Ga. 720, 721 (221 SE2d 556) (1975). We agree with the findings of the trial court in denying the defendant's motion for new trial: "There was evidence sufficient to warrant the jury in finding that the death of Frazier was deliberately planned, conceived and intended by Dulaney and Douthit for the purpose of obtaining the proceeds of an insurance policy purportedly in effect on Frazier's life, payable to Douthit. After Frazier had been slain, his body was deliberately placed on the roadway so that it could be discovered and the insurance collected. The life insurance policy, obtained and allegedly paid by Douthit, was in the possession of defendant, the beneficiary had been changed to Douthit in less than a fortnight from Frazier's murder, and the weapon that caused his death was found in Douthit's possession. This evidence was uncontradicted. A finding by the jury that Douthit, if not the slayer, was the 'mastermind' of the crime, was warranted."

The defendant nevertheless urges that the conviction should be reversed and a new trial granted because the evidence was circumstantial and such evidence did not exclude every other reasonable hypothesis save that of the guilt of the accused. The jury was fully charged on circumstantial evidence and the reasonable hypothesis rule pursuant to Code § 38-109. We do not find from the evidence, or from the lack of evidence, a hypothesis pointing to the innocence of the accused. *Harris v. State,* 236 Ga. 242 (223 SE2d 643) (1976). The defendant's statement to police that Dulaney shot the victim during the defendant's absence does not, when

considered with the other evidence, present a hypothesis of innocence as a matter of law. *Harris v. State,* supra.

2. The defendant asserts that it was error for the court to overrule defendant's motion for new trial as amended on the ground of newly discovered evidence.

The evidence relied on by the defendant as "newly discovered" consisted of evidence that his accounts in two banks had been closed before the murder and that the insurance company was taking the position that the insurance was not in force after October 28, 1975, the last date for which payment had been received. (Defendant concedes that this information was also unknown to the district attorney.)

The defendant relies on *Bell v. State,* 227 Ga. 800, 805 (183 SE2d 357) (1971), where the court set out six criteria that must be satisfied for the grant of a new trial on newly discovered evidence. In *Pulliam v. State,* 199 Ga. 709 (2) (35 SE2d 250) (1945), the court considered a motion for new trial based on newly discovered evidence almost identical to the case under consideration. There the court said in headnote (2) "In a trial for murder where, as a motive, the State introduces testimony that the accused was the beneficiary of certain life-insurance policies on the lives of parties killed by the act for which he was being tried, and from which policies he would receive the proceeds, and where subsequently to the trial, suit is brought upon the policies by the accused, and he then learns that the policies were not enforceable contracts at the time of the homicide, and where he then files an extraordinary motion for new trial based upon the newly discovered evidence of the non-existence of any life insurance, and in said motion there is no evidence that would establish knowledge of the accused at the time of the homicide that the insurance policies were not enforceable, such evidence would not be sufficient to authorize this court to hold that the trial judge abused his discretion in overruling the extraordinary motion for new trial." The court went on to say: "The question of the presence or absence of motive is not necessarily determined by the jury on the correctness of conclusions drawn by the accused from a state of facts, but the jury may ascribe as a motive for a crime a belief or conclusion

which is erroneous and based upon his misconception of facts."

As shown in the statement of facts, the life insurance policy was obtained by the defendant, it was in his possession, he had been named the beneficiary less than two weeks earlier, and he had checked to find out that the change in beneficiary had in fact been made.

*Pulliam v. State,* supra, points out that to obtain a new trial based on newly discovered evidence under the circumstances presented here, the defendant must show that he knew at the time of the homicide that the insurance was not in force. Such a showing cannot be made on motion for new trial based on new evidence because the first requirement of such a motion is that the defendant first learned of the evidence after the trial. *Bell v. State,* supra. A defendant cannot learn after trial what was known to him at the time of the homicide. Moreover, the evidence before the trial court showed that the insurance company was seeking payment of the premiums even after the homicide. The court below did not err in overruling this ground of the motion for new trial.

3. The defendant asserts that it was error for the court to allow the state to file answers and affidavits in response to defendant's amended motion for new trial based on allegedly newly discovered evidence after the time specified orally by the court for the district attorney to respond to the motion. At the hearing on the amended motion for new trial, the judge accepted the response of the state over objection by the defendant. The state's response was filed within about a month of the filing of the motion and the court's order overruling the motion was entered several weeks later. The trial judge has wide discretion in controlling the time of response to motions for new trial and no error has been shown here.

The defendant alleges it was error for the court to allow the state to file the affidavit of James H. Kelly and exhibits thereto for consideration in connection with the motion for new trial, since this was evidence that could have been available to the state prior to trial. The challenged affidavit is that of a handwriting examiner who compared the defendant's signatures with the change

of beneficiary form and found reason to believe that the defendant prepared the change of beneficiary form. This examination was made after the trial. The defendant urges that the examiner could have made his examination before trial and hence the evidence was not allowable under *Bell v. State,* supra, in that the state failed to show due diligence in acquiring it. *Bell v. State* sets forth the requirements applicable to the movant who claims newly discovered evidence. The requirements of *Bell v. State* are not applicable to the state in a criminal case.

4. The defendant urges that it was error for the court to excuse a named juror for cause, because the juror stated to the court that he would automatically vote against capital punishment without regard to any evidence that might be developed in the trial of the case. The defendant asserts that it was improper to death qualify the jury on the guilt/innocence phase of the trial because under a bifurcated system such qualification is only proper, he urges, if at all, during the sentencing phase and the excuse from the guilt/innocence trial of those veniremen who oppose the death penalty is impermissible because they constitute a distinct class that must not be excluded from the jury.

The venireman stated in response to questioning by the court that his feelings toward capital punishment were such that he would never vote to impose the death penalty regardless of the facts of the case, and he would automatically vote against capital punishment without regard to any evidence that might be developed in the trial. Confronted with this statement of unalterable opposition to the imposition of the death penalty, it was not error for the trial court to excuse the venireman for cause. Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). We note that another venireman who expressed only general opposition to the death penalty was not so excused. However defendant's argument goes beyond Witherspoon.

In the next case after Witherspoon the United States Supreme Court considered defendant's "prosecution prone" argument in Bumper v. North Carolina, 391 U. S. 543 (88 SC 1788, 20 LE2d 797) (1968), and rejected it for

lack of evidence to support the theory. The defendant in the case before us has adduced no evidence to support his claim and consequently this enumeration of error is without merit.

5. The defendant alleges it was error for the court to admit into evidence, over defendant's objection, the three pieces of lead described by the state as bullets. The defendant argues that the chain of custody of three bullets taken from the head of the victim was not properly established. The pathologist testified that he removed the bullets from the body of the victim and turned them over to the firearms identification expert. The firearms identification expert testified that he received the bullets from the pathologist and that they had been in his custody until he surrendered them to the district attorney on the day of trial. That the pathologist testified that he couldn't be sure that the bullets presented to him at trial were the same ones he removed from the victim's body does not render the bullets inadmissible. This enumeration is without merit.

6. The defendant asserts that it was error for the court in the sentencing phase of the trial to charge the jury on aggravating circumstances. He argues that there was no evidence to authorize such instructions. He alleges that it was error for the court to submit three aggravating circumstances to the jury in writing. He argues that by selecting three out of the ten statutory aggravating circumstances (Code Ann. § 27-2534.1), the court emphasized those three and thereby expressed an opinion and influenced the jury. The defendant also asserts that it was error for the jury to impose the death penalty on the ground that "The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value." He urges that the evidence was insufficient to support such a finding. He urges particularly that the evidence did not show that he changed the beneficiary or that he knew that he was named beneficiary.

The court charged the jury on three possible aggravating circumstances, as follows: (1) that the offender committed the offense of murder for himself or another, for the purpose of receiving money or any other

thing of monetary value; (2) that the offender caused or directed another to commit murder or committed murder as an agent or employee of another person; and (3) the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim. The jury based its decision on the first ground.

There was evidence, albeit circumstantial, to support the jury's finding and the trial court's instruction that the murder was committed for the purpose of receiving money. Our statute requires that the statutory aggravating circumstances determined by the trial judge to be warranted by the evidence be given to the jury in charge and in writing. Code Ann. § 27-2534.1; *Eberheart v. State,* 232 Ga. 247, 254 (206 SE2d 12) (1974); *Harris v. State,* 237 Ga. 718, 721 (230 SE2d 1) (1976).

We are not concerned at this point with the question of guilt but are with punishment. Our death statute is not written so as to preclude the imposition of the death penalty where the evidence is circumstantial. In fact, the death penalty based on circumstantial evidence has been imposed and approved by this court. *Banks v. State,* 235 Ga. 121, 124 (218 SE2d 851) (1975); 237 Ga. 325 (227 SE2d 380) (1976). The circumstantial evidence in this case excludes from reasonableness the hypothesis that the offender committed the offense without monetary motive. In addition to the defendant's auto shopping trip, his inquiries as to whether the change of beneficiary had been made and his statements to Beasley regarding the victim and insurance, the defendant admitted leaving the body at the place where it would be found. These enumerations are without merit.

7. *Sentence review.* In our sentence review we have considered the aggravating circumstance found by the jury and the evidence concerning the crime. We have reviewed the sentence as required by Ga. L. 1973, p. 159, et seq. (Code Ann. § 27-2537(c) (1-3)), as we have in each case involving a death penalty under this statute. We conclude that the sentence of death imposed on Ronald Douthit was not imposed under the influence of passion, prejudice, or other arbitrary factor.

The jury found as a statutory aggravating

circumstance that the offender committed the offense of murder for himself or another for the purpose of receiving money or any other thing of monetary value (Code Ann. § 27-2534.1(b)(4)), and the evidence, albeit circumstantial, supports the jury's finding.

In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed and we find that those similar cases set forth in the appendix support affirmance of the death penalty. In each of the nineteen cases listed there the defendant killed for money or monetary gain. In seven of these cases the jury found the same aggravating circumstance as was found here by the jury. In two of those cases the motive for murder was to collect life insurance proceeds. The evidence shows that the defendant Ronald Douthit planned the death of Leonard Karl Frazier to obtain money. Ronald Douthit's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

*Judgment and sentence affirmed. All the Justices concur.*

ARGUED JANUARY 11, 1977 — DECIDED MAY 12, 1977 — REHEARING DENIED MAY 27, 1977.

*Eugene A. Deal,* for appellant.
*Tom Charron, District Attorney, B. Wayne Phillips, Arthur K. Bolton, Attorney General, Isaac Byrd, Staff Assistant Attorney General,* for appellee.

APPENDIX.

Similar cases considered by the court: *Lingo v. State,* 226 Ga. 496 (175 SE2d 657) (1970); *Johnson v. State,* 226 Ga. 511 (175 SE2d 840) (1970); *Howard v. State,* 231 Ga. 186 (200 SE2d 755) (1973); *Hunter v. State,* 231 Ga. 494 (202 SE2d 441) (1973); *Morgan v. State,* 331 Ga. 280 (201 SE2d 468) (1973); *Morgan v. State,* 233 Ga. 360 (211 SE2d 285) (1974); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1974); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Tamplin v.*

*State,* 235 Ga. 774 (221 SE2d 455) (1975); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976);*Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Hill v. State,* 237 Ga. 794 (229 SE2d 737) (1976); *Young v. State,* 237 Ga. 852 (230 SE2d 287) (1976).